ANDREW ALLEN d. b. p. in error *vs.* Negro SARAH, et al. p. b. d. in error.

> A slave illegally exported from this state, is entitled to freedom from the time of such exportation.
And the issue of a female slave so exported, born after exportation, are free, and their freedom may be decreed though the mother may not have obtained a decree declaring her free.
On proof of exportation, it is for the claimant to show a license, which will not be presumed.
The act of 1793, prohibiting the exportation of slaves, is constitutional.

WRIT of error to the Superior Court, Kent county. ₀

*Coram.*—THE CHANCELLOR, HARRINGTON and LAYTON, Judges.

This case came up on appeal from the decree of the Superior Court of Kent county, made at the May term, 1836, establishing the freedom of the complainants below, negroes Sarah and others, who were held in slavery by the defendant.

The case presented the following facts. William Owens of Sus-

sex county, died possessed of a certain negro girl named Amelia, a slave for life, who at his death went into the possession of Jean Owens, his administratrix. About the year 1799, a certain Denwood Hicks, who had married Mary, the daughter of William Owens, brought an action of replevin against Jean Owens, in Sussex county, and recovered Amelia, with ten other negroes, whom he afterwards removed from this state to the State of Maryland, contrary, as it was alledged, to the laws of this state.

In 1801, Amelia escaped from the service of Hicks, and returned into this state. Subsequently she was found in the possession of Andrew Allen, who claimed and held her as his slave in this state for nearly thirty years, but by what authority, or in what right he claimed her, did not appear. It was alledged, that he purchased her of a person named Raymond Alston, but this fact was not established, nor was Alston's right to the service of Amelia, in any way proved. It was in evidence, however, that this Alston was a negro trader from one of the southern states, and that Hicks actually sold all of the other negroes which he took from this state, to the traders, after he had taken them into Maryland.

Amelia had three children, after she returned into this state, to wit: Sarah, Grace and Bayard, three of the petitioners; the other petitioners were children of Sarah and Grace.

The petitioners founded their claim to freedom on the fact, that their ancestor, Amelia, was taken by Hicks, out of this state into the State of Maryland, contrary to the provisions of the act of assembly of 1793, whereby Amelia became *entitled* to *her freedom.*

This claim was resisted on the following grounds—

1st. That the act of assembly of 1793, is in contravention of the second section of the fourth article of the constitution of the United States, which declares that " the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

2d. That supposing, under the act, it was an improper exportation of Amelia, such exportation did not, ipso facto, establish her freedom; but that it was necessary to have a judicial adjudication upon the facts; that the freedom did not attach on the exportation but on the decree, without which decree, neither Amelia nor her issue were entitled to freedom. And a case was referred to in Sussex, that of the *State* vs. *Spicer,* in which it was said to have been decided that a slave was not made free *ipso facto* by the exportation, but only by the decree, and from the date of the decree of freedom.

3d. That the fact of Amelia remaining as a slave of Allen for thirty years, precluded her descendants from any right to freedom on the ground of laches, and the abandonment of their claim; and, in truth,

that they had no right to claim their freedom otherwise than on the ground of a *decree* establishing the freedom of their ancestor Amelia, made on her application.

4th. That "after this lapse of time, a permit or license to Hicks to export Amelia, was to be *presumed.*"

*Judge Layton* delivered the opinion of the court.

LAYTON, *Justice :*—A presumption of the payment of a debt may arise from the lapse of time. So too, a grant or deed may be presumed in favor of an individual who has been in the peaceable and undisturbed possession of lands for twenty years. Because it is consistent with public policy, that there should be an end of litigation. But there is no case of presumption of a license to violate a penal statute; or of the temporary dispensation of the sanctions of such a law. And the presumption that a license to export was ever in fact granted, is rebutted, if it ever could legally arise, from the fact that if ever any such license to Hicks existed, it must have been under the act, a matter of record in the court which granted that license; and the production of that license devolved upon Hicks and those claiming under him.

It is true, where a negro has been claimed and held as a slave in this state, the presumption of law is that he is a slave, and the *onus probandi* rests upon him to show that he is entitled to his fredom. But this, like every other legal presumption may be rebutted. And when a negro claims to be entitled to his freedom in consequence of his having been exported from this state, contrary to the provisions of the statute, and proves the exportation, the burthen of proof is then shifted upon the master, and he must satisfy the court that the negro was lawfully exported.

2d. The court are of opinion that " the fact of Amelia's remaining in the service of Allen for thirty years," does not bar the right of her descendants to freedom, if any such right ever existed. Nor can the doctrine of laches, neglect, and a sleeping upon one's rights be made to apply to questions involving the liberty of a human being. A man may lose his right to the possession of property by his laches, and by permitting another to enjoy it for a term which the law deems sufficient to raise the presumption of a grant in favor of the occupant. But we have never yet seen or heard of a case where any person was adjudged to have lost his liberty, on the ground that he had neglected to assert his rights. The fifth article of the amendment to the constitution of the United States, declares that " no person shall be deprived of life, liberty or property, without due process of law." The moment an individual becomes entitled to his liberty, he instantly becomes the subject of constitutional protection; nor can he again

be reduced from the condition of a freeman, " without due process of law." It follows then if Amelia, by any means whatever, was ever entitled to her freedom, she could not divest herself of that right, by mere neglect to assert it. And further, that all her rights to freedom attached to, and devolved upon her children born after that right accrued.

We may well imagine why Amelia never asserted her claim to freedom. She may have been entirely ignorant of her rights, or she may have been, whilst in the service of Allen, prevented and debarred from the opportunity of doing so. The doctrine contended for would enable a party to take advantage of his own wrong. He would have nothing to do, but by force, persuasion or other means, to restrain the negro from proceeding for his freedom, for such time as would raise the presumption of abandonment, and then successfully resist a claim, originally founded in right.

3d. This was not the case of a master carrying his slaves out of this state, on his removal with his family into another state. If it be conceded, as indeed the proof in the cause is, that under the act of assembly, it was an improper exportation of Amelia, we have no difficulty in deciding that such exportation did, ipso facts, establish her freedom; and that a judicial adjudication upon the facts, was wholly unnecessary to enable her children, born after the exportation, to their freedom.

The fourth section of the act of 1793, (2 *Del. Laws*, 1094,) declares " that if any person or persons, being the owner or owners of any slave or slaves, his agent or factor, shall, after the passing of this act, export or sell, with an intent for exportation, or carry out for sale, from this state, any negro or mulatto slave, without a license or permit as aforesaid first had and obtained from the justices of the court aforesaid, every such negro or mulatto slave, so exported, or sold with an intention for exportation or carried out for sale, is hereby declared free, and intitled to enjoy all the privileges that a free negro or mulatto may or can do within this state." The right and title to freedom does not arise or result from the act of adjudication by the court; it attaches the moment the offence is committed, which is prohibited by the statute. For the act declares that " every such negro or mulatto slave so exported, or sold with an intention of exportation, &c., *is hereby declared free, &c.* ; not that he shall be free upon the facts being found, on a judicial adjudication in his favor. Even the selling of a slave, " with an intention for exportation;" although *he may* not in point of fact, have been carried out of the state, entitles him to his freedom. His right to freedom becomes a *vested right,* immediately upon the perpetration of the offence by his master, of unlaw-

fully exporting him, or of selling him " with an intention of exportation."
The judicial adjudication does not create that right, it only ascertains
and establishes it, from the facts which show that it previously existed;
and such, indeed, is the language of the act of 1760, (1 *Del. L.* p. 381,)
regulating the mode of petitioning for freedom, on the part of the negro.
The second section of that act prescribes that " after hearing the
proofs and allegations of the parties in a summary way, it shall and
may be lawful to and for the said justices, if they are satisfied that
the person so petitioning, or on whose behalf such petition shall be
presented, *is entitled to his or her freedom,* to discharge such person
from the service of his or her pretended master, &c. and to adjudge
and decree, that such person *is* and shall be free," &c.

Suppose a clear case of unlawful exportation of a negro, under the
act of 1793.   The negro escapes from the service of his master, and
files his petition for freedom.   After a lapse of two years or more,
during all which time he has been in the employment of another per-
son, the court finally adjudges him free, and discharges him from the
service of his pretended master.   Will it for a moment be contend-
ed that the master could maintain an action for the wages, work
and labor of the negro, against the individual who had employed
him ?   On the contrary, the 4th section of the act of 1760, expressly
gives to the negro " an action for false imprisonment, or any other
action in the law that may be proper in such case, against such pre-
tended master or mistress, for unlawfully holding and detaining such
person as aforesaid, *before* or after his or her discharge." &c.

It might with as much truth be contended, that an heir at law had
no right to recover in ejectment, lands to which he had shown a
clear title, because his ancestor had not sued for them, and obtained
a " judicial adjudication" in his favor, as that a negro is not entitled
to his freedom, because his ancestor, who *was* clearly entitled, did
not prosecute his claim to judgment.

Two cases have been decided in Maryland, precisely in point.
Vide 3d *Harris & Johnson's Rep.* 491–3.   We have no report of the
case cited of the *State* vs. *Spicer,* and do not know the extent and
ground of that decision.   But if the case was as stated, we may well
suppose the decision to have been right.   Upon an indictment for a
highly penal offence, the court would guard the admissibility of
evidence, in reference to rights of the prisoner, upon the prin-
ciples of the criminal law.   It was also a collateral question; and,
on principle, could not have been inquired into in that case.   On the
trial of an indictment for kidnapping, against a white man, a negro
was called as a witness for the prosecution, and his competency ob-
jected to.   It was admitted that he had been a slave, but he claimed

that he was now a *free* man, because he had been exported from the state contrary to law; and, as there had been no adjudication of his freedom, the court very properly refused to go into a trial of this collateral question, and rejected his testimony, without thereby deciding any thing as to the validity of his claim to freedom.

But the question of Amelia's freedom, or slavery, resulting from her exportation, is not collateral to this cause; it is the very matter in issue in it; and upon which the freedom of the petitioners, her descendants, rests.

4th. It only remains for us to consider whether the act of 1793 is in contravention of the second section of the fourth article of the constitution of the United States. We are unanimous in the opinion that it is not. The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states. But the citizen of another state becoming entitled to property in this state acquires, and must hold it, according to the laws of this state. It is no privilege or immunity of any citizen of this state to export his slaves; on the contrary, he is expressly forbidden, under a penalty, to do so. If a citizen of another state can come here and have that privilege, it would be to repeal our law; and violate the very provision of the constitution referred to, by giving him other privileges and immunities than those enjoyed by the citizens of this state. It must be admitted that the proposition contained in that article is not universally true. For instance, the elective franchise is not, nor can it be pretended, that under this article of the constitution, it can be enjoyed by the citizens of other states, in common with our own citizens.

This act was intended to prevent the crime of kidnapping; to restrain the traffic in human beings, and gradually to abolish slavery in this state. Similar laws have been passed in several of our sister states; which laws have been subjected to the examination, and received, incidentally, the sanction of the Supreme Court of the United States. These laws have never been declared to be unconstitutional, although the great amount of property, and the delicacy of the principles involved, and the frequency of suits and proceedings under those acts, would long since have produced such a decision, if indeed, the objection be a sound one. The property in slaves, is not an absolute, but a qualified property. It is the right to the enjoyment of the services of the slave during his life. It is not such a right of property as gives the power of unlimited control over the slave. The slave has rights. He is under the protection of the law, and it was for his protection, as well as for subserving the principles of humanity, that the law of 1793 was passed. The general policy of

that law, and its operation and influence over this unfortunate race of human beings have been found to be beneficial.

It is unnecessary to pursue this branch of the inquiry further; particularly, as, in case, if this court has erred on this point, there is a method of correcting that error.

The members of this court are unanimous in the opinion, that the petitioners are entitled to their freedom, and that the decree of the court below should be affirmed.